# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| **JASON BRIAN RAKES,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | |
| | ) | **No. 13-1471-JWL** |
| **CAROLYN W. COLVIN,** | ) | |
| **Acting Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER

Plaintiff seeks review of a decision of the Commissioner of Social Security (hereinafter Commissioner) denying Social Security Disability (SSD) benefits under sections 216(i) and 223 of the Social Security Act.  42 U.S.C. §§ 416(i) and 423 (hereinafter the Act).  Finding no error, the court ORDERS that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING the decision.

## I.    Background

Plaintiff applied for SSD, alleging disability beginning November 15, 2008.  (R. 12, 133-37).  In due course, Plaintiff exhausted proceedings before the Commissioner, and now seeks judicial review of the final decision denying benefits.  He alleges the Administrative Law Judge (ALJ) erred in finding that his condition does not meet or equal Listing 11.03; improperly rejected the treating source opinion of Dr. Mullinix,

substituted his own medical judgment for that of Dr. Mullinix, and placed controlling weight on the state agency doctors' opinions; should have recontacted Dr. Mullinix or ordered a consultative examination regarding Plaintiff's seizures; did not consider Plaintiff's limitations resulting from his impairments and improperly assumed that Plaintiff would only be off task about 10% of the time; and failed to conduct a determination whether Plaintiff's impairments are medically equivalent to a Listed Impairment.

The court's review is guided by the Act.  Wall v. Astrue, 561 F.3d 1048, 1052 (10th Cir. 2009).  Section 405(g) of the Act provides that in judicial review "[t]he findings of the Commissioner as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  The court must determine whether the ALJ's factual findings are supported by substantial evidence in the record and whether he applied the correct legal standard.  Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007); accord, White v. Barnhart, 287 F.3d 903, 905 (10th Cir. 2001).  Substantial evidence is more than a scintilla, but it is less than a preponderance; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971); see also, Wall, 561 F.3d at 1052; Gossett v. Bowen, 862 F.2d 802, 804 (10th Cir. 1988).

The court may "neither reweigh the evidence nor substitute [its] judgment for that of the agency."  Bowman v. Astrue, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting Casias v. Sec'y of Health & Human Servs., 933 F.2d 799, 800 (10th Cir. 1991)); accord,

Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005).  Nonetheless, the determination whether substantial evidence supports the Commissioner's decision is not simply a quantitative exercise, for evidence is not substantial if it is overwhelmed by other evidence or if it constitutes mere conclusion.  Gossett, 862 F.2d at 804-05; Ray v. Bowen, 865 F.2d 222, 224 (10th Cir. 1989).

The Commissioner uses the familiar five-step sequential process to evaluate a claim for disability.  20 C.F.R. §§ 404.1520, 416.920; Wilson v. Astrue, 602 F.3d 1136, 1139 (10th Cir. 2010) (citing Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988)).  "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary."  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In the first three steps, the Commissioner determines whether claimant has engaged in substantial gainful activity since the alleged onset, whether he has a severe impairment(s), and whether the severity of his impairment(s) meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1).  Williams, 844 F.2d at 750-51.  After evaluating step three, the Commissioner assesses claimant's RFC.  20 C.F.R. § 404.1520(e).  This assessment is used at both step four and step five of the sequential evaluation process.  Id.

The Commissioner next evaluates steps four and five of the sequential process--determining at step four whether, in light of the RFC assessed, claimant can perform his past relevant work; and at step five whether, when also considering the vocational factors of age, education, and work experience, claimant is able to perform other work in the

3

economy.  Wilson, 602 F.3d at 1139 (quoting Lax, 489 F.3d at 1084).  In steps one

through four the burden is on Plaintiff to prove a disability that prevents performance of

past relevant work.  Blea v. Barnhart, 466 F.3d 903, 907 (10th Cir. 2006); accord,

Dikeman v. Halter, 245 F.3d 1182, 1184 (10th Cir. 2001); Williams, 844 F.2d at 751 n.2.

At step five, the burden shifts to the Commissioner to show that there are jobs in the

economy which are within the RFC assessed.  Id.; Haddock v. Apfel, 196 F.3d 1084,

1088 (10th Cir. 1999).

       Although Plaintiff's arguments are somewhat jumbled and do not necessarily

follow a logical sequence, the court will attempt to address each argument in an order

which reduces the number of times the court relies upon the ALJ's findings on an issue

with regard to which Plaintiff alleges the ALJ erred before the court has considered that

alleged error.  Because Plaintiff's argument with regard to Listing 11.03 relies upon

allegations of error in the ALJ's weighing of the medical opinions, the court begins its

analysis with consideration of the weight assigned to the opinion evidence.

## II.     Evaluation of the Opinion Evidence

       Plaintiff claims the ALJ erred in weighing the medical opinion of Dr. Mullinix, his

treating neurologist, and improperly assigned "controlling weight" to the state agency

physicians' opinions.  He argues that the ALJ misunderstood the medical records of Dr.

Mullinix and erroneously substituted his lay opinion for that of the physician even though

"he admits that Dr. Mullinix made an inadvertent error in her otherwise controlling

authority report."  (Pl. Br. 9).  The court does not agree.

On August 3, 2011, Dr. Mullinix provided a five-section "Medical statement regarding [Plaintiff's] seizures."  (R. 449).  In section one she noted that Plaintiff suffered from generalized seizures, myoclonic seizures, and staring seizures.  Section two asked for the "[a]pproximate frequency of convulsive seizures," and Dr. Mullinix checked the block, "[m]ore than once a day."  Id.  Section three asked for the "[a]pproximate frequency of non-convulsive seizures," and Dr. Mullinix crossed out the entire section.  In section four, Dr. Mullinix stated that Plaintiff had "[e]xcellent" compliance with treatment, and in section five she indicated that cognitive impairment was a side effect of Plaintiff's medications.  Id.

The ALJ explained his evaluation of Dr. Mullinix's opinion:

Janis [sic][1] Mullinix, M.D., the claimant's medical provider, indicated that the claimant has multiple types of seizures, including generalized seizures, myoclonic seizures, and staring (Exhibit 18F, p.l).  However, Dr. Mullinix indicated the claimant has convulsive seizures more than one a day and never has non-convulsive seizures.  This is inconsistent with the medical record and the claimant's own testimony.  As a result, it appears Dr. Mullinix inadvertently reversed the "checkboxes" when completing this form.  Accordingly, that portion of the form receives little weight, though the rest of the form is credited.

(R. 18).

The ALJ's finding is supported by the record evidence.  Dr. Mullinix's records from May 2009 through August 2011 record only two grand mal seizures--in February and October 2010 (R. 414, 466, 469)--and daily "myoclonic jerks" (R. 414, 421, 466) or

---

[1]Dr. Mullinix's signature block indicates her first name is "Janice."  (R. 449).

"daily little spells in which his hands shake as he is falling asleep."  (R. 426).  Clearly,

Dr. Mullinix did not intend to assert that Plaintiff has zero <u>non-convulsive</u> seizures and

more than one <u>convulsive</u> seizure every day.  Therefore, it was correct for the ALJ to

credit the physician's opinions regarding types of seizures, compliance with treatment,

and cognitive impairment as a side effect of medications, while according little weight to

the portion of the form regarding daily convulsive seizures and zero non-convulsive

seizures.

Plaintiff agrees with the ALJ's assessment regarding section two of Dr. Mullinix's

form, noting that the ALJ recognized the physician's answer in section two was

inadvertent, but he argues that Dr. Mullinix intended to mark section three to indicate that

Plaintiff experienced non-convulsive seizures more than once a day.  (Pl. Br. 7).

However, Plaintiff has not shown that the ALJ found otherwise.  The ALJ did not

substitute his own opinion for that of Dr. Mullinix, rather, he appears to have given effect

to Dr. Mullinix's "actual" opinion.  The ALJ recognized that Plaintiff's seizure disorder

was a severe impairment (R. 14), and that he has infrequent grand mal seizures (R. 17,

18), and more frequent myoclonic jerks or staring seizures.  (R. 15, 17, 18).  This is

consistent with Dr. Mullinix's form--even as Plaintiff understands it, and with the weight

the ALJ accorded to that form.  Although the ALJ points to some record evidence "which

is not consistent with reports of daily petit mal seizures" (R. 18), he accepted that

"claimant has some continued seizure activity that includes myoclonic jerks or 'staring'

episodes," and he found "some evidence of staring or petit mal seizures [is] credible."

6

(R.18).  Moreover, the ALJ found that Plaintiff has moderate limitations in concentration, persistence, and pace, and "may have brief episodes totaling up to 10% of the workday in which he is off-task due to symptom manifestation (of underlying <u>seizure</u> & cognitive disorder)."  (R. 16) (underline added).  The court notes that up to 10% of a workday totals as much as 48 minutes each day of being off-task due to cognitive disorder, myoclonic jerks, or staring seizures.

Plaintiff argues that the ALJ should have contacted Dr. Mullinix for an "explanation as to why she inadvertently checked box 2 instead of box 3."  (Pl. Br. 8).  However, as both the ALJ and Plaintiff agree, Dr. Mullinix's checking of box 2 instead of box 3 was clearly inadvertent.  Therefore, there is no reason to contact Dr. Mullinix.  Contrary to Plaintiff's argument, and as discussed above, the ALJ did not ignore Dr. Mullinix's findings.  He evaluated them, and as to her actual, intended findings, he "credited" them--indicating that he accepted them.  (R. 18).

The fact that the ALJ also accorded significant weight to the opinion of the examining psychologist, Dr. Smith, and to the opinions of the state agency physicians and psychologists does not mean that he gave controlling weight or greater weight to those opinions.  The court does not find, and Plaintiff does not cite to, any of those opinions which is inconsistent with or which cannot be accepted alongside of Dr. Mullinix's opinion.  Moreover, the ALJ specifically noted that he had assessed additional limitations beyond those opined by the state agency physicians because of the potential hazards that could result from Plaintiff's seizures.  (R. 18).

Plaintiff appears to be of the opinion that the mere presence of non-convulsive seizures occurring more than once a day is conclusive of disability, and that if the ALJ had credited Dr. Mullinix's opinion to that affect he would have found that Listing 11.03 is met, and would have approved Plaintiff's application.  (Pl. Br. 7-8) (If Dr. Mullinix had checked box 3 instead of box 2 "[P]laintiff's DIB application surely would have been granted by the ALJ, as [P]laintiff meets Listing 11.03 based on Dr. Mullinix's evaluation.").  As will be demonstrated in the court's consideration of Plaintiff's argument that his condition meets Listing 11.03, the mere presence of non-convulsive seizures occurring more than once a day is <u>not</u> conclusive of disability.  Plaintiff has shown no error in the evaluation of the medical opinions.

Plaintiff also argues that it was error for the ALJ to discount Plaintiff's wife's opinion for the reason that it was a lay opinion and not based on objective medical evidence and testing.  He argues that his wife is a registered nurse in the pediatric ICU at Wesley Medical Center, and her opinion should have been evaluated in accordance with Social Security Ruling (SSR) 06-3p as an opinion of an "other medical source" rather than of a "non-medical source."  The Commissioner agrees with Plaintiff that the ALJ was mistaken to refer to Mrs. Rakes's opinion as a lay opinion, but argues that the opinion was properly discounted.  The court finds no error.

As Plaintiff's argument suggests, Mrs. Rakes completed three third-party function reports regarding Plaintiff's abilities.  (R. 175-83, 240-47, 268-75).  The ALJ accorded these opinions "little weight" because they are lay opinions, because they are based on

casual observation rather than objective medical evidence and testing, because they allege greater limitations than Plaintiff alleges or the record supports, and because they do not outweigh the accumulated medical evidence.  (R. 19).  Plaintiff's only objection to the ALJ's discounting of the opinions is that "[i]t is impermissible for the ALJ to reject [P]laintiff's wife's testimony just because she is not an acceptable medical source, . . .when she is a specialty nurse."  (Pl. Br. 13).

There are at least two problems with this argument.  First, and perhaps most importantly, the ALJ did not reject Mrs. Rakes's testimony "just because she is not an acceptable medical source."  As noted above, the ALJ stated five reasons to discount Mrs. Rakes's opinions.  Moreover, none of the reasons given was that she was not an acceptable medical source.  The ALJ did not even mention that fact.  In fact, Plaintiff's expertise as a nurse is irrelevant to her opinions expressed in the third-party function reports.  Nothing in the reports suggests that the opinions are based on medical knowledge or expertise.  Although Plaintiff argues that Mrs. Rakes is a speciality nurse, there is simply no record evidence to that effect.  Mrs Rakes testified that she works as a nurse in the pediatric ICU, but she did not testify that she is a specialty nurse, and the record contains nothing regarding her expertise or background in nursing.  Moreover, even if the court were to accept that Mrs. Rakes is a specialty nurse in pediatrics, Plaintiff has shown no relation between her medical specialty and her opinion regarding seizures in her husband or her husband's resulting limitations in function.  Second, as the ALJ noted, each of the third-party function reports completed by Mrs Rakes was completed as

a lay opinion based upon her knowledge as Plaintiff's "spouse." (R. 175, 240, 268). In each report, Mrs. Rakes specifically noted that her relationship to the disabled person was as his spouse. Id. Nowhere in the reports did Mrs. Rakes state that any portion of her opinion was based upon particular knowledge or expertise gained in her training or work as a nurse or that she had made her observations or evaluations relying upon medical skill. The ALJ was correct to rely upon those opinions as "lay opinions" as one of several factors in discounting them.

## III.    Failure to Develop the Record

Plaintiff claims that the ALJ was required to order a consultative examination in order to properly evaluate Plaintiff's seizure activity. He argues this is so because he testified that he is unable to function while having a seizure and the ALJ acknowledged that he has a seizure disorder which is a severe impairment, but that the ALJ "only had evidence of the underlying medical condition and did not evaluate the effect this condition had on [P]laintiff's ability to work." (Pl. Br. 11-12) (citing Exs. 6F, 11F). The Commissioner argues that there was no need to order an additional consultative examination because "the record contained sufficient evidence from which the ALJ could evaluate Plaintiff's RFC" (Comm'r Br. 16), and because Plaintiff's representative did not suggest at the hearing that further development was necessary. (Comm'r Br. 17).

The Commissioner "has broad latitude in ordering consultative examinations." Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).

> [But, t]he ALJ has a basic obligation in every social security
> case to ensure that an adequate record is developed during the
> disability hearing consistent with the issues raised.  This is
> true despite the presence of counsel, although the duty is
> heightened when the claimant is unrepresented.  The duty is
> one of inquiry, ensuring that the ALJ is informed about facts
> relevant to his decision and learns the claimant's own version
> of those facts.

Henrie v. U.S. Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th
Cir. 1993) (citations, quotations, and brackets omitted).  Further, under 20
C.F.R. § 404.1512(e), "[w]hen the evidence [the agency] receive[s] from [a
claimant's] treating physician or psychologist or other medical source is
inadequate for [the agency] to determine whether [the claimant is] disabled,
[the agency] will need additional information to reach a determination or a
decision."

Cowan v. Astrue, 552 F.3d 1182, 1187 (10th Cir. 2008).

> "Ordinarily, the claimant must in some fashion raise the issue sought to be
> developed which, on its face, must be substantial.  Specifically, the claimant
> has the burden to make sure there is, in the record, evidence sufficient to
> suggest a reasonable possibility that a severe impairment exists."  If she
> does so, then the ALJ's duty to order a consultative examination arises.
> "Isolated and unsupported comments by the claimant are insufficient, by
> themselves, to raise the suspicion of the existence of a nonexertional
> impairment."

Flaherty v. Astrue, 515 F.3d 1067, 1071 (10th Cir. 2007) (quoting Hawkins v. Chater,

113 F.3d 1162, 1167 (10th Cir. 1997)) (citations omitted).

Here, Plaintiff, who was represented by counsel before the ALJ, did not request the

ALJ to order an additional consultative examination.  Further, the record contains

sufficient evidence for the ALJ to make a decision regarding disability.  Exhibits 6F and

11F as cited in Plaintiff's Brief are the reports of Dr. Smith's psychological examinations,

and do not require additional examination because the ALJ explained his evaluation of

11

those reports, and Plaintiff does not allege error in that evaluation.  Plaintiff's assertion that Dr. Smith "noted that [P]laintiff <u>could not perform even simple tasks</u> with the persistence required" (Pl. Br. 12) (emphasis added), is not an accurate representation of the report and does not require further examination.

In his first report (Ex. 6F), Dr. Smith opined that Plaintiff "may have some problems understanding and following simple instructions," and "may have difficulty working persistently at tasks" because of problems with attention and memory, but he also noted that "[f]urther testing would be helpful to determine the nature and extent of [Plaintiff's] impairment and the level of his intellectual functioning."  (R. 383).  Further testing was ordered, and Dr. Smith's second report (Ex. 11F) is the report prepared after completion of that testing.  (R. 402-407).  After the additional testing, Dr. Smith concluded that Plaintiff "should have <u>no problems</u> understanding and following simple instructions," but that he still "may have difficulty working persistently at tasks."  (R. 404) (emphasis added).  Thus it is clear that Dr. Smith did not opine that Plaintiff does not have the <u>persistence required</u> for simple tasks, but rather, that he "<u>may have difficulty</u> working persistently."  (R. 404) (emphasis added).

The ALJ recognized this scenario, and accorded "limited weight" to Dr. Smith's first report (R. 18), but "significant weight" to the second report.  (R. 19).  He specifically emphasized Dr. Smith's opinion that Plaintiff "<u>may</u> have difficulty working persistently." <u>Id.</u> (emphasis in original).  Moreover, the ALJ explained that Plaintiff "may have brief

episodes totaling up to 10% of the workday in which he is off-task due to symptom manifestation (of underlying seizure & cognitive disorder)." (R. 16).

Plaintiff's argument that the ALJ "did not evaluate the effect [Plaintiff's seizure disorder] had on [P]laintiff's ability to work" (Pl. Br. 12), is equally unavailing. The record evidence contained Plaintiff's and his wife's testimony and their other reports of Plaintiff's seizure activity and the limitations allegedly resulting therefrom. (R. 32-67, 175-200, 240-49, 253-75, 282-89). The record contained medical treatment records regarding Plaintiff's seizure disorder both from when he resided in Missouri and after he moved to Kansas; it contained the psychological consultative examination reports of Dr. Smith; it contained the medical opinions and reports of the state agency medical and psychological consultants; and it contained the opinion of Dr. Mullinix. (R. 306-470). And, the ALJ considered, summarized, and discussed this evidence. (R. 15-19). He specifically discussed the effects of Plaintiff's seizures, to include their postictal effects on Plaintiff's functioning and his ability to work. Plaintiff has not shown what further information regarding his seizure activity was missing from the record and was necessary in order for the ALJ to make a decision in this case. He has shown no basis to find that the ALJ failed in his duty to develop the record in this case.

## IV. Listing 11.03, Non-Convulsive Epilepsy

The primary thrust of Plaintiff's argument is his claim that his condition meets the criteria of Listing 11.03 for non-convulsive epilepsy, and that the ALJ erred in finding that he did not meet this Listing. In fact, Plaintiff's counsel made this argument as his

legal theory at the hearing.  (R. 32).  Plaintiff asserts that the ALJ determined his

condition does not meet the Listing "because there is no evidence that [P]laintiff suffers

from postictal behavior."  (Pl. Br. 5).[2]  He argues that the evidence (his testimony, his

wife's testimony, and Dr. Mullinix's report) establishes that he has petit mal seizures

more than once a day, with postictal activity.  Id. at 6.  The Commissioner argues that

"the ALJ reasonably concluded transient postictal symptoms were limited to Plaintiff's

infrequent grand mal seizures," that the record does not support Plaintiff's assertion that

the record reflects that he suffers most of the postictal seizure manifestations listed on the

epilepsy.com web site as alleged by Plaintiff, and that substantial evidence supports the

finding that Plaintiff's condition does not meet or equal a Listed Impairment.

### A.    Standard for Evaluating Listing 11.03

The Commissioner has provided a "Listing of Impairments" which describes

certain impairments that she considers disabling.  20 C.F.R. §§ 404.1525(a), 416.925(a)

(2012); see also, 20 C.F.R., Pt. 404, Subpt. P, App. 1 (Listing of Impairments).  If

plaintiff's condition meets or equals the severity of a listed impairment, that impairment

is conclusively presumed disabling.  Williams, 844 F.2d at 751; see Bowen v. Yuckert,

482 U.S. 137, 141 (1987) (if claimant's impairment "meets or equals one of the listed

impairments, the claimant is conclusively presumed to be disabled").  However, Plaintiff

---

[2]"Ictal" means "Relating to or caused by a stroke or seizure."  Steadman's Medical
Dictionary 846 (26th ed. 1995).

"Postictal" means "Following a seizure."  Id. at 1413.

"has the burden at step three of demonstrating, through medical evidence, that his impairments 'meet <u>all</u> of the specified medical criteria' contained in a particular listing." <u>Riddle v. Halter</u>, No. 00-7043, 2001 WL 282344 at *1 (10th Cir. Mar. 22, 2001) (quoting <u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990) (emphasis in <u>Zebley</u>)).  "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify" to meet or equal the listing.  <u>Zebley</u>, 493 U.S. at 530.

"The [Commissioner] explicitly has set the medical criteria defining the listed impairments at a higher level of severity than the statutory standard.  The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing <u>any</u> gainful activity, not just 'substantial gainful activity.'" <u>Zebley</u>, 493 U.S. at 532-33 (emphasis in original) (citing 20 C.F.R. § 416.925(a) (1989)). The listings "streamlin[e] the decision process by identifying those claimants whose medical impairments are so severe that it is likely they would be found disabled regardless of their vocational background." <u>Yuckert</u>, 482 U.S. at 153.  "Because the Listings, if met, operate to cut off further detailed inquiry, they should not be read expansively." <u>Caviness v. Apfel</u>, 4 F. Supp. 2d 813, 818 (S.D. Ind. 1998).

The Listing at issue here provides:

11.03  <u>Epilepsy--nonconvulsive epilepsy (petit mal, psychomotor, or focal), documented by detailed description of a typical seizure pattern including all associated phenomena, occurring more frequently than once weekly in spite of at least 3 months of prescribed treatment.</u>  With alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference with activity during the day.

20 C.F.R., Pt. 404, Subpt. P, App. 1 § 11.03 (emphasis in original).  As Plaintiff suggests, in finding that Listing 11.03 is not met or equaled, the ALJ focused on the second sentence of the Listing, which he called the "second requirement."  (R. 15).

The "first requirement" of the listing, which is not at issue here, contains four elements:  (1) non-convulsive epilepsy (petit mal, psychomotor, or focal); (2) documented; (3) seizures occurring more than once weekly; and (4) at least 3 months of prescribed treatment.  The "second requirement" also consists of multiple elements which can be met by alternative means.  The first element of the "second requirement" provides that the seizures must produce a mental state which will be demonstrated by alteration of awareness or loss of consciousness.  The second element of the "second requirement" provides that the seizures must produce transient postictal manifestations which will be demonstrated by unconventional behavior or significant interference with activity during the day.

### B.    Analysis

As the court's explanation of the legal standard above reveals, the mere presence of epilepsy with non-convulsive seizures occurring even more frequently than once a day is not sufficient to meet the severity of Listing 11.03.  Those factors only demonstrate that the first three elements of the "first requirement" are met.  Plaintiff must also demonstrate that the "second requirement" is met--alteration of awareness or loss of consciousness and transient postictal manifestations of unconventional behavior or significant interference

with activity during the day.  Here, as the ALJ found, Plaintiff has not shown transient postictal manifestations of significant interference with activity during the day.

The ALJ determined that the second requirement of Listing 11.03 is not met because Plaintiff "resumes normal activity with no postictal manifestations."  (R. 15). Plaintiff asserts that the evidence establishes that his petit mal seizures occur more than once a day, and include postictal manifestations (including "most" of the manifestations presented on the epilepsy.com web site (Pl. Br. 11)) which require a finding that the Listing is met.  (Pl. Br. 6-7).

Although the record shows that Plaintiff experiences many of the postictal manifestations presented on the epilepsy.com web site, the evidence is that those manifestations occur after Plaintiff has a grand mal convulsive seizure.  The Listing for that type of seizure is Listing 11.02, and Plaintiff admittedly does not experience such seizures more frequently than once a month as required by that Listing.  Moreover, the ALJ discussed the issue of postictal manifestations after Plaintiff's petit mal seizures as covered by Listing 11.03:

> The claimant reports infrequent grand mal seizures with daily petit mal seizures.  Both the claimant and his wife report up to 80 petit mal seizures per month (Exhibit 5 E, p.1; Exhibit 6E, p.1).  (Subsequent reports indicate a decreased frequency (Exhibit 19E, p.1; Exhibit 21E, p.1).)  Both parties also report tonic-clonic movements and a prolonged postictal state. However, the claimant's testimony clearly states that he does not have any postictal manifestations of his petit mal seizures (involving staring).  This suggests that the descriptions of postictal effects are applicable to his more infrequent grand mal seizures.

17

Prior to his alleged onset date, the claimant's records indicate a history of seizures. This condition was described as stable on medication (Exhibit 1F, p.7, 9; Exhibit 5F, p.14). At one point, only two months prior to his alleged onset date, the claimant reports only four seizures in three months, which is not consistent with reports of daily petit mal seizures and suggests this condition was reasonably controlled (Exhibit 5F, p.10). Later records from 2010 indicate one or two grand mal seizures per year, with no report of petit mal seizures (at one point, he is reported seizure-free tor four months in 2010) (Exhibit 12F, p.7, 8). Records from 2011 indicate no grand mal seizures on new medications, although the claimant alleges some continued myoclonic jerking activity (Exhibit 19F, p.9, 17).

It appears that while the claimant has some continued seizure activity that includes myoclonic jerks or "staring" episodes, this behavior is not particularly enduring or limiting. Moreover, while he has experienced grand mal seizures, such events are infrequent and of brief duration based on the evidence of record.

Although the undersigned finds some evidence of staring or petit mal seizures credible, there is no medical evidence or other reports indicating these are frequent or result in any significant postictal phenomena as required in order to meet the disability criteria of listing 11.03. Moreover, the claimant's testimony indicates postictal symptoms in response to grand mal or myoclonic (jerking) seizures, which, according to his records, occur very infrequently. As a result, while anti-seizure precautions, as identified in the residual functional capacity, are warranted, additional limitations are not.

(R. 17-18).

As the ALJ recognized, Plaintiff and his wife submitted seizure questionnaires in February 2010 which indicated seizures about 20 times a week, several postictal manifestations, and a long postictal state. (R. 17) (citing Exs. 5E, 6E). Plaintiff indicated his postictal manifestations include confusion, headaches, muscle aches, nausea, memory loss, and sleepy days for up to a week after the seizure, depending on the seizure. (R. 186). His wife indicated the manifestations are confusion, migraines, severe short term

18

memory loss, exhaustion, and muscle aches which last up to a week depending on the length and severity of the seizure.  In September, 2010, Plaintiff and his wife once again completed seizure questionnaires which, as the ALJ noted, showed less frequent seizures occurring about 7 to 10 times a week.  (R. 17) (citing Exs. 19E, 21E).  Plaintiff's wife indicated nasea, extreme vomiting, extreme memory loss, loss of coordination, and migraine headaches as postictal manifestations which lasted 48 to 72 hours.  (R. 255).  Plaintiff stated that his postictal manifestations were confusion, headaches, vomiting blood, urinating on himself, and loss of coordination which lasted for "days."  (R. 263).

At the hearing Plaintiff testified that his inability to work was primarily due to petit mal seizures which he has several times a day, each of which lasts for "maybe 30 seconds to a couple minutes."  (R. 41).  When the ALJ asked what goes on when Plaintiff has one of these petit mal seizures, Plaintiff responded:

> Well, sometimes I kind of space off and shake a little bit.  And sometimes it's just like -- just-- it's just in the hand, you know?  Other times it's my whole arm, just starts moving away.  It's just things like that.  I drop things. So I couldn't hold important things.  I don't cook because of it.  I -- that's pretty much it.  The petit mals keeps me from -- I had a plate of food one time and dropped it on the ground because of it.

(R. 41-42).

Later, Plaintiff's attorney asked further questions regarding the petit mal seizures (R. 49-52), and Plaintiff explained that he has myoclonic jerks in which he shakes and his arms move, and that these occur mostly at night, but that they also occur "during the day, two, three.  Three [sic] times a week."  (R. 50).  When his counsel pressed him on the

issue, Plaintiff stated that his hand jerks daily, "Maybe two, three times an hour, maybe?" and that "those may just last just a few seconds?" (R. 51). Counsel then asked about the staring episodes, and Plaintiff explained that he doesn't know what goes on with those, that he didn't even know he did them until people pointed them out to him. Plaintiff stated that the staring episodes might last 30 seconds and that while they are taking place, he cannot be roused from them. (R. 52).

Counsel called Plaintiff's wife to testify regarding Plaintiff's seizures also. She described his myoclonic jerks as "real quick little jerks of his hands. Just like a quick jerk of the muscles." (R. 65). She explained that he may lose awareness or consciousness during the myoclonic jerks, "[i]f they go on long enough. If it's just a split second one, like just where he'll drop a plate or something, then he's awake and alert. But if he'll have them back to back, for a time frame of, like, 30 to 45 seconds, then yeah, he'll phase out a little bit." Id. She testified that Plaintiff has the brief, split-second myoclonic jerks 10 to 20 times a day. (R. 66). She testified that Plaintiff has "absent seizures, where he just stares" about three times a day, and they last about two minutes. (R. 67).

Taken together, this evidence supports the ALJ's finding that "the description of postictal effects are applicable to [Plaintiff's] more infrequent grand mal seizures." At the hearing, both Plaintiff and his wife testified that the moclonic jerks and the staring seizures were short-lived--either brief jerks or staring seizures lasting up to two minutes. As the ALJ found, there was no suggestion at the hearing that these short-lived seizures involved any significant postictal manifestations. Further, the ALJ found that Plaintiff's

allegations of symptoms are not credible, and Plaintiff does not claim error in that

finding.  Moreover, as the court found above, the ALJ properly accorded "little weight" to

Plaintiff's wife's opinion.  Therefore, to the extent the ALJ found that Plaintiff and his

wife exaggerated the frequency and effect of Plaintiff's petit mal seizures, the court finds

no error in that regard.  The ALJ's finding is reasonable and supported by the record, and

the ALJ noted that he had included anti-seizure precautions in the RFC assessed.  Those

precautions include:  no exposure to workplace hazards, no operation of motorized

vehicles or heavy equipment, and no carrying of spillable items or items that would be

dangerous if dropped.  (R. 16).

In similar fashion, Dr. Mullinix's treatment records do not show significant

postictal manifestations following Plaintiff's short-lived, non-convulsive seizures.  In her

note dated December 21, 2009, she mentions Plaintiff's report of his hands shaking but

does not mention postictal manifestations.  (R. 426).  On February 24, 2010, Dr. Mullinix

noted that Plaintiff had a grand mal seizure two weeks earlier and turned blue.  (R. 414).

She also noted that Plaintiff reported "twitches as he is going to sleep or on awakening,"

and suggested that "these are myoclonic jerks," but she said nothing regarding postictal

manifestations.  Id.  On June 7, 2010, she noted that Plaintiff has "occasional myoclonic

jerks when he is stressed or if he has bad headaches," and that the jerks "may cause him

to drop things."  (R. 415).  But she did not mention postictal manifestations.  In her

treatment note dated December 16, 2010, Dr. Mullinix recorded a tonic-clonic (grand

mal)[3] seizure which occurred in October 2010 which started with "more myoclonic

twitches that day."  (R. 469).  She noted some of the postictal manifestations from the

grand mal seizure and noted that "he is having the myoclonic jerks on a daily basis," and

that agitation makes them worse, but she did not note any postictal manifestations after

the myoclonic jerks.  In the May 3, 2011 treatment note, Dr. Mullinix noted that Plaintiff

continues to have daily myoclonic jerks which are worse at night during his sleep, but she

said nothing of postictal manifestations.  (R. 466).  On August 3, 2011, Dr. Mullinix

noted Plaintiff's wife's report that Plaintiff "is having fewer daytime myoclonic jerks but

still has multiple myoclonic jerks at night," but, once again, did not mention postictal

manifestations.  (R. 453).  As the ALJ noted, the record does not show postictal

manifestations after Plaintiff's myoclonic jerks, or after his staring seizures.  Substantial

record evidence supports his findings in this regard.

### C.     Medical Equivalence

Plaintiff also argues that the ALJ failed to conduct an equivalency determination

and failed to make an equivalency finding.  Medical equivalence to a listing must be

established by showing that the claimant's impairment(s) "is at least equal in severity and

duration to the criteria of any listed impairment."  20 C.F.R. §§ 404.1526(a), 416.926(a).

The determination of medical equivalence is made without consideration of vocational

factors of age, education, or work experience.  20 C.F.R. §§ 404.1526(c), 416.926(c).  As

---

[3]In her May 3, 2011 note, Dr. Mullinix noted that Plaintiff "has had no further
grand mal seizures since the one in October 2010."  (R. 466).

Plaintiff argues, at the ALJ level of decision it is the ALJ's responsibility to decide medical equivalence.  But, the burden to show medical equivalence is on the Plaintiff. See, e.g., Zebley, 493 U.S. at 530; Riddle, 2001 WL 282344 at *1.

Contrary to Plaintiff's assertion that the "ALJ failed to make an equivalency finding" (Pl. Br. 15), the ALJ specifically found that Plaintiff "did not have an impairment or combination of impairments that . . . medically equaled the severity of one of the listed impairments.  (R. 14) (bold omitted, underline added).  To the extent that Plaintiff asserts the ALJ failed to conduct an equivalency determination, he ignores that the burden of proof is on Plaintiff at this step of the evaluation process, he points to no medical evidence in the record which is at least equal in severity and duration to the criteria of Listing 11.03, and he does not explain which criterion or criteria of that Listing are allegedly equaled by the side effects of his medication, or by his pain--as suggested in his brief.  Moreover, the criterion the ALJ found was not met was transient postictal manifestations of significant interference with activity during the day, and Plaintiff does not point to record medical evidence demonstrating equivalence in severity and duration to this criterion of the Listing.  Although the ALJ is required to explain why a Listing is not medically equaled, he is not required to provide an explanation when the record evidence does not appear to suggest equivalence.  Plaintiff has shown no error in the ALJ's finding that Listing 11.03 is not met or medically equaled.

## V.    Plaintiff's Limitations

Plaintiff argues that instead of properly considering the limitations resulting from his impairments, the ALJ arbitrarily assumed that he would be off-task up to 10% of the time due to symptoms resulting from seizures and cognitive impairment, but that the evidence supports "a lack of persistence far in excess of 10%." (Pl. Br. 13). The evidence upon which Plaintiff relies in making this argument is the reports of Dr. Smith and Dr. Mullinix and the testimony of Plaintiff and his wife. Id. The court finds no error.

Herein the court has already discussed the evidence upon which Plaintiff relies to assert that Plaintiff will be off-task far more than 10% of the time. However, that evidence supports the ALJ's determination. As discussed above, the testimony of Plaintiff and his wife, and Dr. Mullinix's treatment notes support the finding that Plaintiff's non-convulsive seizures are either brief myoclonic jerks or staring seizures which last from 30 seconds to two minutes, and the evidence does not show postictal manifestations of significant interference with activity during the day. Moreover, the ALJ discussed Dr. Smith's reports and determined that Plaintiff's difficulty working persistently could be accommodated along with the petit mal seizures by providing that those factors would cause him to be off task for brief episodes up to 10% of a workday. The record evidence supports the ALJ's finding, and Plaintiff points to no record evidence which precludes that finding.

Plaintiff's arguments do not show error in the Commissioner's decision.

**IT IS THEREFORE ORDERED** that judgment shall be entered pursuant to the fourth sentence of 42 U.S.C. § 405(g) AFFIRMING that decision.

24

Dated this 10th  day of December 2014, at Kansas City, Kansas.


s:/ John W. Lungstrum
**John W. Lungstrum**
**United States District Judge**